**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 12-2085**

_____

DEVIN HAMDEN,

                Plaintiff - Appellee,

     v.

TOTAL CAR FRANCHISING CORPORATION,

                Defendant - Appellant.

_____

Appeal from the United States District Court for the Western District of Virginia, at Roanoke. James C. Turk, Senior District Judge. (7:12-cv-00003-JCT)

_____

Argued: September 19, 2013      Decided: November 22, 2013

_____

Before NIEMEYER, GREGORY, and FLOYD, Circuit Judges.

_____

Affirmed in part; reversed in part by unpublished opinion. Judge Gregory wrote the opinion, in which Judge Niemeyer and Judge Floyd joined.

_____

**ARGUED:** Thomas Meredith Winn, III, WOODS ROGERS P.L.C., Roanoke, Virginia, for Appellant. Robert Edwin Dean, II, FRITH & ELLERMAN LAW FIRM, PC, Roanoke, Virginia, for Appellee. **ON BRIEF:** Frank K. Friedman, Frank H. Hupfl, III, WOODS ROGERS, P.L.C., Roanoke, Virginia, for Appellant. T. Daniel Frith, III, Lauren M. Ellerman, FRITH & ELLERMAN LAW FIRM, PC, Roanoke, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

Appellant Total Car Franchising Corporation d/b/a Colors on Parade ("TCF") appeals the district court's order finding that a franchising agreement's restrictive covenants do not apply to a former franchisee. The contract at issue dictated various restrictions that would occur upon termination of the agreement. The issue before us is whether the natural end of the contract qualifies as termination. We find that the district court correctly defined termination within this context, but termination was not necessary to trigger one of the restrictive covenants at issue. Accordingly, we affirm in part and reverse in part.

I.

Appellee Devin Hamden operated a TCF franchise in Virginia and West Virginia from 1996 until 2011. TCF is a South Carolina corporation providing auto repair and restoration services, focusing on paint restoration and paintless dent repair. Hamden learned of TCF through a friend, Phil Barker, who worked for TCF. Hamden worked as an apprentice to Barker in 1995. Subsequently, TCF offered Hamden an opportunity to become a TCF franchisee.

2

On May 9, 1996, Hamden executed two documents granting him status as a TCF franchisee performing paintless dent repair.[1] The first of these was the Limited Rights Franchise Agreement ("Franchise Agreement"). The Franchise Agreement set the term of the agreement at fifteen years. It further noted that Hamden could renew the agreement at the end of the fifteen-year term if he provided notice of his intent to do so during a certain time period "before this Agreement's expiration[.]" The Franchise Agreement further designated the area in which Hamden could provide paintless dent repair services.

Section 9 of the Franchise Agreement, entitled "Rights and Duties of Parties Upon Expiration, Termination or Non-renewal," contained a post-term non-competition clause operational "[f]or 2 years following the termination of this Agreement." This covenant prohibited Hamden's participation in a paint restoration business. Section 9 also imposed certain duties, such as the return of TCF property, upon termination of the Agreement "for any reason."

---

[1] The parties agreed to certain modifications deviating from TCF's standard franchise agreement. Having consulted with an attorney prior to entering into the agreements, Hamden lowered the royalty fees due to TCF from 40% to 27%. Hamden also included a provision protecting his unrestricted right to use, upon cessation of his franchisee status, any knowledge, skills, and training acquired prior to signing the agreements.

The parties contemporaneously executed a Non-Competition and Confidentiality Agreement ("Confidentiality Agreement"), which the Franchise Agreement incorporated by reference. The Confidentiality Agreement contained three relevant restrictive covenants.[2] The Confidentiality Agreement's non-competition clause provided that

> If the Franchise Agreement is terminated before its expiration date, or if you assign or transfer your interest in the Franchise Agreement, to any person or business organization except according to Section 7 of the Franchise Agreement, then You covenant, for a period of 2 years after termination, transfer or assignment, not to engage as an owner, operator, or in any managerial capacity, in any business engaged in the same or similar type of appearance technologies within the metropolitan statistical area in which the Franchise Agreement's Designated Marketing Area is located, other than as an authorized franchisee or employee of another Colors on Parade franchise.

The non-disclosure clause stated, in pertinent part, that

> During the term of the Franchise Agreement and thereafter, you agree not to communicate directly or indirectly, divulge to or use for your benefit or the benefit of any other person or legal entity, any trade secrets which are proprietary to Colors on Parade or any information, knowledge or know-how deemed confidential under Section 5 of the Franchise Agreement, except as we permit. If there is any termination of this Agreement, You agree that you will never use our confidential information or trade secrets, in the design, development or operation of

---

[2] The Confidentiality Agreement also contained a severability clause, providing for enforcement of the remainder of the agreements in the event any given provision or clause is stricken.

4

> any business specializing in appearance technologies
> as Colors on Parade applies them.

The non-solicitation clause provided that

> During the term of the Franchise Agreement and for 2
> years after its termination or after its assignment or
> transfer, You agree that You will neither directly nor
> indirectly solicit, induce, divert or take away any
> customer within the statistical marketing area in
> which the DMA is located where [Hamden] actually
> served during the term of this Agreement.

Hamden performed paintless dent repair as a TCF franchisee for the entirety of the fifteen-year term, which ended May 9, 2011. Unaware of the term's end, Hamden continued working thereafter as a franchisee. Only upon receiving an email from TCF in October 2011, reminding him that the term ended and he could still renew the Franchise Agreement, did Hamden realize the term ended. On November 30, 2011, having decided to pursue his own business, Hamden, through a conversation with Barker, informed TCF he would not seek renewal. Hamden reiterated this position a few days later in a meeting with TCF Chief Executive Officer Jeffrey Cox. Hamden's franchisee status ended on December 3, 2011. TCF informed Hamden of its intent to pursue an injunction and damages in the event Hamden proceeded with his business. Hamden thereafter sought a declaratory judgment in the district court.

5

After a one-day bench trial, the district court held that the restrictive covenants did not bind Hamden.[3] The district court first held that "termination" as used in the restrictive covenants did not encompass an "expiration" brought about by the natural end of the term. On this basis, the district court found the non-competition and non-solicitation clauses non-binding on Hamden. With respect to the non-disclosure covenant, the district court held that Hamden either complied with the covenant by his return of TCF property or was not bound by it due to lack of termination. The district court further concluded that Section 9's post-term restriction applied only to "paint restoration," not the paintless dent repair work Hamden performed.

TCF timely filed an appeal over which we retain jurisdiction pursuant to 28 U.S.C. § 1291.

II.

In reviewing rulings from a bench trial, we review factual findings for clear error and conclusions of law de novo. Helton v. AT&T Inc., 709 F.3d 343, 350 (4th Cir. 2013). Conclusions of

---

[3] The district court denied Hamden's request for attorney's fees and costs, a ruling that is not on appeal.

law include contract construction. <u>Roanoke Cement Co. LLC v.</u> <u>Falk Corp.</u>, 413 F.3d 431, 433 (4th Cir. 2005).

## III.

TCF advances two arguments supporting its position that the district court erred with respect to the non-disclosure and non-solicitation provisions. First, TCF avers that termination under the agreements encompasses the natural end of the contract. As such, all of the restrictive covenants requiring termination of the agreements should apply to Hamden. Second, TCF contends that the restrictive covenants impose reasonable limitations on Hamden and are thus enforceable.

We apply Virginia interpretation principles to this dispute, as state law governs contractual matters. <u>James v.</u> <u>Circuit City Stores, Inc.</u>, 370 F.3d 417, 421-22 (4th Cir. 2005). Under Virginia law, we "construe the contract as a whole" when ascertaining the meaning of any portion or provision of a contract, such as those situations where parties dispute the meaning of a term or phrase. <u>Doctors Co. v. Women's Healthcare</u> <u>Assocs., Inc.</u>, 740 S.E.2d 523, 526 (Va. 2013); <u>Am. Spirit Ins.</u> <u>Co. v. Owens</u>, 541 S.E.2d 553, 555 (Va. 2001). An agreement "complete on its face" is unambiguous and thus precludes the need for any search beyond the instrument itself in construing the contract. <u>Ross v. Craw</u>, 343 S.E.2d 312, 316 (Va. 1986).

7

Any ambiguity that arises in the contractual language is construed against the drafter. Doctor's Co., 740 S.E.2d at 526. However, a contractual provision is not ambiguous merely because the parties disagree as to the provision's meaning. TM Delmarva Power, L.L.C. v. NCP of Va., L.L.C., 557 S.E.2d 199, 200 (Va. 2002). Virginia law presumes parties do not include meaningless contract provisions. Ross, 343 S.E.2d at 317. Thus, we will not interpret a clause in a manner rendering it meaningless so long as a reasonable meaning can be attributed thereto. Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 624 (4th Cir. 1999) (citing Berry v. Klinger, 300 S.E.2d 629, 633 (Va. 1965) and Winn v. Aleda Constr. Co., 315 S.E.2d 193, 195 (Va. 1984)).

Ascertaining enforceability requires us to first address the threshold issue of whether termination encompasses the expiration of the Franchise Agreement at the end of its fifteen-year term. Only then may we consider which provisions, if any, are applicable and whether they are enforceable.[4]

A.

TCF argues that this threshold issue may be resolved by a straightforward application of dictionary definitions and cases

---

[4] Finding that "termination" did not include "expiration", the district court held that the provisions were not triggered, and thus did not address the enforceability of the provisions' substantive restrictions.

finding no difference between "terminate" and "expire" when construing a contract. TCF further contends that the language of the contract as a whole presents an expansive definition of termination, evidenced by its use of the broad modifier "any" when referring to termination.

Hamden counters by reasoning that "termination" and "expiration" are not necessarily analogous, and the contract's use of both indicates a different meaning for the terms. In light of the fact that another section within the contract used "expiration" to refer to the natural end of the fifteen-year term, Hamden maintains that "terminate" and "expire" carried different meanings in the parties' agreements.[5]

In the lexicological sense, termination would include expiration, as the latter is a type of termination. Black's Law Dictionary defines termination as both "the act of ending something" and "the end of something in time or existence;

_____

[5] We decline Hamden's invitation to find ambiguity simply because the contractual language could be understood as bearing multiple meanings. Hamden cites Lincoln National Life Insurance Company v. Commonwealth Corrugated Container Corporation, 327 S.E.2d 98 (Va. 1985), where the Supreme Court of Virginia held that ambiguous language within an insurance policy should be construed strictly against an insurer. Id. at 101. However, we must find more than mere disagreement between the parties; ambiguity must arise from the contract as a whole, not from the consideration of isolated terms or provisions within a vacuum. Resource Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 636 (4th Cir. 2005).

conclusion or discontinuance." Black's Law Dictionary 1609 (9th ed. 2009). It exemplifies this meaning by stating that the termination of employment is "the complete severance of an employer-employee relationship." Id. The unqualified nature of "conclusion or discontinuance," without tying such conclusion to an affirmative act, could reasonably encompass the natural expiration of an agreement. "Expiration" is defined as "a coming to an end; esp., a formal termination on a closing date." Id. at 660. This definition clearly suggests that expiration is reasonably viewed as a form of termination, rather than a distinctly different event altogether. See Mountain Fuel Supply v. Reliance Ins. Co., 933 F.2d 882, 890 n.11 (10th Cir. 1991) (citing cases for the proposition that, in contrast to cancellation, "[e]xpiration is the natural termination of the policy at [a date] set forth in the policy's own terms"). We do not find that the mere use of both terms within the agreements necessitates a different meaning for each. See NaturaLawn of America, Inc. v. West Group, LLC, 484 F. Supp. 2d 392, 401 (D. Md. 2007) (finding that the use of expiration and termination "does not undercut th[e] conclusion" that the terms are analogous).

Viewed as a whole, however, the contract provides support for the notion that termination correlates to an affirmative act and the terms are thus distinct here. TCF relies primarily upon

10

NaturaLawn; however, that case, like other cases cited by the parties, holds limited persuasive value because not all contracts use the same terms in the same manner. Unlike the contract in NaturaLawn, no covenant TCF attempts to enforce explicitly purports to apply upon expiration. Cf. id. at 397 (NaturaLawn's contract language unequivocally noted the restrictions applied "for two years after the termination or expiration of the Franchise Agreement"). Thus, we consider how the Franchise Agreement defines and uses the terms in ascertaining whether the parties use them interchangeably in a manner similar to that in NaturaLawn.

Lacking a section defining the terms, the Franchise Agreement's sole indicator of what constitutes a termination is Section 8. Section 8 states that all rights granted to Hamden would terminate automatically upon the occurrence of the events listed therein. Section 8 also granted Hamden the ability to terminate the agreement voluntarily so long as he remained in compliance with the remaining terms of the agreement and provided proper notice. Expiration, while not explicitly defined, appears in Section 2, which explains that renewal could occur if Hamden provided notice within a set time frame "before this Agreement's expiration."

Under Virginia law, it is fair to read the contract as indicating that termination only occurred upon the occurrence of

11

these listed events in Section 8, none of which were the natural end of the term.  See Clinch Valley Physicians, Inc. v. Garcia, 414 S.E.2d 599 (Va. 1992).  In Clinch Valley, the Supreme Court of Virginia found a non-competition provision inapplicable to nonrenewal where the provision indicated its applicability to termination "for any reasons whatsoever."  Id. at 601.  The court reasoned that the section defining termination solely referenced the employer's right to terminate the contract for cause.  Id.  Therefore, the court held, "any reasons" must be construed with respect to any of the reasons for which the party invoking termination might end the employment contract, and not as inclusive of mere nonrenewal.  Id.  Turning to the case sub judice, Section 8 indicates that termination occurs upon an action:  either Hamden's violation of the Franchise Agreement or his notice of his intent to terminate.  Applying Clinch Valley's principles, the Franchise Agreement's failure to indicate that termination arises passively through expiration, which it recognizes as a separate event in Section 2, indicates that expiration does not trigger the restrictive covenants.  Cf. Specialty Rental Tools & Supply, LP v. Shoemaker, 553 F.3d 415, 421 (5th Cir. 2008) (limiting "terminate" to an affirmative act rather than the mere passage of time where the contract referred to the end of the employment "as 'ending'—not as 'terminating'" on a particular date, and the section defining termination only

12

listed a number of affirmative acts, available to both parties, necessary to end the agreement).

While its binding effect on Hamden is not at issue, we consider Section 9 in ascertaining the meaning of "termination." The rights and duties in Section 9 apply "[i]f this Agreement terminates for any reason, and regardless of any dispute which may exist between [Hamden] and [TCF]." Virginia courts afford an expansive interpretation where a broad modifier such as "any" is used. See Sussex Cmty. Servs. Ass'n v. Va. Soc. for Mentally Retarded Children, Inc., 467 S.E.2d 468, 469-70 (Va. 1996). When considered in isolation and applying the plain meaning of "terminate" and "expire," one may find that termination envelops expiration.[6] However, we consider the modification power of "any" in light of Clinch Valley's holding noted above, and remain mindful that "any" may broadly apply to any reason for an affirmative act of termination.

The Confidentiality Agreement contains two non-competition clauses, which, like Section 9, are not at issue for their

---

[6] We remain unconvinced by TCF's argument that Section 9's heading proves the broad meaning of "termination." Section 9's heading refers to "Expiration, Termination or Non-Renewal," yet nowhere in the text of Section 9 are the terms "expiration" or "non-renewal." Thus, Section 9 can be read as inferring that "termination" refers to any of those three terms. However, for the reasons stated below, we find that the contextual use of the terms does not support this conclusion.

13

binding effect but are informative in ascertaining the context for term construction. In its use of "termination," the non-competition clause in this agreement suggests that termination does not encompass expiration. The second clause of this provision indicates that "[i]f the Franchise Agreement is terminated before its expiration date, or if [Hamden] assign[s] or transfer[s] [his] interest in the Franchise Agreement, . . . then [Hamden] covenant[s], for a period of 2 years after termination, transfer or assignment." This language certainly contemplates the agreement ending before the expiration fifteen-year term. Based upon this language, "termination" and "expiration" bear two separate meanings. The prefatory clause limits the later use of "termination" to include only the end of the parties' relationship prior to the natural expiration. Considering its argument that termination means "the relationship ends, for whatever reasons," TCF's reading would render "before its expiration date" superfluous. If termination included an expiration, then there would be no need to note its application to a termination prior to the expiration date.[7] Thus, in this context, the terms bear different meanings in the Confidentiality Agreement's non-competition provisions.

---

[7] Under TCF's interpretation, the clause could arguably be read as "expiration before the expiration date." This would be nonsensical.

The non-disclosure provision also contains two clauses employing different triggering language. The first clause of the non-disclosure provision notes its applicability "[d]uring the term of the Franchise Agreement and thereafter." This language undisputedly contemplates the natural end of the fifteen-year term and thus binds Hamden from the moment he signed the Franchise Agreement into perpetuity. The second sentence, however, begins "[i]f there is any termination of this Agreement," suggesting an event necessarily different and apart from the natural ending implied by the first clause. Thus, if the first non-disclosure provision references the natural end, then this second provision implicitly requires an ending prior to May 9, 2011. Had TCF intended for this second provision to apply regardless of how the parties' relationship ended, it would have reiterated or modified the language introducing the first non-disclosure provision.

Furthermore, reading "any termination" as broader than simply "terminate" or "termination" in other places within the contract would create more ambiguities than it would solve. As noted above, "termination" in the Confidentiality Agreement's non-competition provision does not encompass an expiration. In light of Clinch Valley's principles noted above, a narrow construction of "termination"—applying only to the active rather than passive use—would be appropriate. To read "termination" in

15

this second clause more broadly than in other provisions would force a signatory to determine whether a term actually carries multiple definitions at different places on the same page of the same document.

The non-solicitation provision restricted Hamden "[d]uring the term of the Franchise Agreement and for 2 years after its termination or after its assignment or transfer[.]" Not having any reference to expiration, one may find reason to believe that termination broadly refers to the point at which the Franchise Agreement ceased to govern the parties' relationship. Application only where the parties ended the relationship before the full term would be nonsensical, as businesses would reasonably seek to protect their interests and client bases regardless of the reason for the end of the franchise relationship. However, we cannot read this provision in isolation from other instances that suggest that expiration is not necessarily a termination. We must afford a uniform definition to "terminate" so as to avoid creating ambiguity through a patchwork of rights dependent upon various triggers for the restrictive covenants.

Having considered the context of the agreements, we find that "termination," as used in the agreements before us, does not encompass expiration. The renewal clause cites the expiration of the agreement, not the termination, and thus

16

suggests that the terms sufficiently differ. Section 8 identifies a number of actions giving rise to a termination. The Confidentiality Agreement's non-compete provision plainly limits its use of termination internally, by the prefatory clause's use of "termination before expiration." The non-disclosure provision first contemplates the natural end of the Franchise Agreement, then introduces "if there is any termination" in a manner suggestive that the phrases references an event different and apart from "the term of the Agreement and thereafter." The non-solicitation provision does not internally reference expiration in an either explicit or implicit manner like the non-competition and non-disclosure provisions. However, guided by both the need for a consistent definition and the holding in Clinch Valley, we must construe it narrowly such that "termination" excludes "expiration". Thus, we read the agreements to mean that "termination" refers to the end of the parties' relationship prior to May 9, 2011.[8]

### B.

Having concluded that "termination" does not encompass expiration under this set of agreements, we find unenforceable

---

[8] Furthermore, even assuming that the context did not demonstrate the material difference in the terms, ambiguities are construed against the drafter, in this case, TCF. Doctor's Co., 740 S.E.2d at 526.

17

the non-disclosure and non-solicitation provisions to the extent they rely upon the Franchise Agreement's termination.

1.

The second clause of the non-disclosure provision requires "any termination" and could thus only apply in the event that the parties' ended the agreement prior to May 9, 2011, the natural expiration of the fifteen-year term.  Being that the agreement reached its natural conclusion, TCF may not enforce the second clause of the non-disclosure provision, although this does not affect its ability to enforce the first clause.[9]  The non-solicitation clause is similarly unenforceable against Hamden, as it only applied during Hamden's time as a franchisee and "for 2 years after [the agreement's] termination or after its assignment or transfer[.]"  Thus, having read "expiration"

_____

[9]  The unenforceability of this second clause may not substantively reduce TCF's ability to protect its confidential information.  The first clause prohibits Hamden from 1) communicating TCF's trade secrets to another or 2) otherwise using them for his gain, unless TCF permits him to do so.  The second clause requires Hamden to "never" use the same information to design, develop, or operate any business "specializing in appearance technologies."  The use of information to design, develop, or operate a business in the same business as TCF would require either communication to another or use for Hamden's own gain.  The substantive difference appears to be that a natural expiration of the Franchise Agreement could result in permissive use of TCF's confidential information, whereas a premature end would not leave such a possibility.  Accordingly, it seems unlikely that Hamden could perform the actions proscribed in the second clause in a manner than does not run afoul of the first.

18

as falling beyond the bounds of "termination," the non-solicitation clause does not apply to Hamden.

2.

However, the district court erred in finding that the first non-disclosure clause did not apply to Hamden.[10] The first non-disclosure clause operates "[d]uring the term of the Franchise Agreement and thereafter[.]" The parties agree that Hamden fulfilled his requirements and the franchisor-franchisee relationship endured for the full fifteen-year term. Unlike the remaining clauses in dispute, termination is not required to trigger this restriction. Accordingly, at no time after entering the agreement can Hamden, without TCF's permission, "communicate directly or indirectly, divulge to or use for [his] benefit or the benefit of any other person or legal entity" TCF's proprietary and confidential trade secrets. Hamden concedes the validity of this first clause of the non-disclosure provision and its application to him. At no point does he argue that the substantive restrictions imposed thereby rendered it

---

[10] The district court's discussion did not explicitly find error in the first clause. Rather, the court noted, only after analyzing both clauses, that "Hamden has either already complied with the non-disclosure clause or is not bound by its restrictions." However, the district court concluded its opinion by finding that "he is not bound by any of the restrictive covenants in the Franchise Agreement or Non-Competition Agreement." Thus, we read the court's ruling to have stricken the entirety of the non-disclosure clause.

unenforceable. The fact that Hamden fully complied with the covenant as of the time of the district court's decision does not lift the restriction. "Thereafter" denotes indefinite continuance in the future. Thus, the district court's ruling that the first clause of the non-disclosure provision no longer applied was erroneous.

## IV.

To conclude, we find that termination did not encompass expiration at the end of the fifteen-year term. However, part of the non-disclosure covenant applies upon expiration. Hence, Hamden remains bound by the first sentence of the non-disclosure provision.

<u>AFFIRMED IN PART;</u>
<u>REVERSED IN PART</u>

20